1    **GUTRIDE SAFIER LLP**
     ADAM J. GUTRIDE (State Bar No. 181446)
2    SETH A. SAFIER (State Bar No. 197427)
     TODD KENNEDY (State Bar No. 250267)
3    KRISTEN SIMPLICIO (State Bar No. 263291)
4    835 Douglass Street
     San Francisco, California 94114
5    Telephone: (415) 336-6545
     Facsimile:  (415) 449-6469
6
7    Attorneys for Plaintiff

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11
     DAVID ELIAS, an individual, on behalf of          CASE NO. 12-cv-00421 (LHK)
12   himself, the general public and those similarly situated
                                                       PLAINTIFF'S OPPOSITION TO
13       Plaintiff,                                    DEFENDANT'S MOTION TO
                                                       DISMISS SECOND AMENDED
14          v.                                         COMPLAINT

15                                                     Date:  March 28, 2013
     HEWLETT-PACKARD COMPANY; AND DOES 1               Time:  1:30 pm
16   THROUGH 50                                        Place:  Courtroom 8, 4th Floor
                                                       Judge:  Hon. Lucy H. Koh
17       Defendants

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................1

II.   BACKGROUND AND ALLEGATIONS ..................................................................3

III.  ARGUMENT ..............................................................................................................9

    A.   Legal Standard For Motion To Dismiss ........................................................9

    B.   Plaintiff Adequately Pleads Each Cause Of Action. ......................................9

        1.   Plaintiff Adequately Pleads A Breach of Express Warranty Under
            California Law. ...................................................................................9

        2.   Plaintiff Adequately Pleads Violation of Implied Warranty Under
            California's Song-Beverly Act...........................................................12

        3.   Plaintiff Adequately Pleads Violations of the UCL, FAL, CLRA and
            Fraud. ................................................................................................14

            a.   HP Affirmatively Misrepresented The Upgraded Computers It
                Advertised And Sold.............................................................16

            b.   HP's Actionable Omissions. ............................................20

            c.   HP Had A Duty To Disclose The Safety Risk Associated With
                The Underpowered Computers It Advertised and Sold. ................22

        4.   Plaintiff Relied, To His Detriment, On HP's Affirmative
            Misrepresentations and Omissions............................................23

    C.   If Any Allegations Are Insufficient, Leave To Amend Should Be Granted...............25

IV.   CONCLUSION............................................................................................................25

# **TABLE OF AUTHORITIES**

## **CASES**

*Aaronson v. Vital Pharmaceuticals, Inc.*, 09—CV—1333 W(CAB), 2010 U.S. Dist. LEXIS 14160 (S.D. Cal. Feb. 17, 2010) ................................................................. 14

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ........................... 24

*Alvarez v. Chevron Corp.*, 656 F.3d 925, No. 09-56698, 2011 U.S. App. LEXIS 18211 (9th Cir. Sept. 1. 2011) .......................................................................................... 14

*Annunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133 (C.D. Cal. 2005) ........................ 18

*Baba v. Hewlett-Packard Co.*, No. C 09-05946 RS, 2010 U.S. Dist. LEXIS 59747 (N.D. Cal. June 16, 2010) ............................................................................................... 21

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ................................................. 9

*Berenblat v. Apple, Inc.*, 2009 U.S. Dist. LEXIS 80734 (N.D. Cal. Aug. 21, 2009) ......... 14

*Brittalia Ventures v. Stuke Nursery Co., Inc.*, 153 Cal. App. 4th 17 (2007) ................... 14

*Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513 (2004) .......................................... 16

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (1999) ............................................................................................................. 15, 25

*Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220 (CD. Cal. 2011) ............ 23

*Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663 (2006) ........................... 15

*Collins v. eMachines*, 202 Cal. App. 4th 249 (2011) ................................................. 20, 21

*Conley v. Gibson*, 355 U.S. 41 (1957) .............................................................................. 9

*Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351 (2003) ....... 15, 17

*Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service Inc.*, 911 F.2d 242 (9th Cir. 1990) ................................................................................................. 17

*Daugherty v. American Honda Motor Co., Inc.*, 144 Cal.App.4th 824 (2006) .......... 12, 21

*Davis v. Scherer*, 468 U.S. 183 (1984) ............................................................................. 9

*Decker v. Mazda Motor of Am., Inc.*, 2011 U.S. Dist. LEXIS 124182 (C.D. Cal. Oct. 24, 2011) .................................................................................................................. 12

*DeSoto v. Yellow Freight Sys.*, 957 F.2d 655 (9th Cir. 1992) ......................................... 25

*Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908 (C.D. Cal. 2010) ........................ 14

*Elias v. Hewlett-Packard Co.*, 2012 U.S. Dist. LEXIS 146811 (N.D. Cal. Oct. 11, 2012) ............................................................................................................................ 1, 12

*Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951 (1997) .............................. 16

*Falk v. General Motors Corp.*, 780 F. Supp. 2d 1088 (N.D. Cal. 2007) ......................... 16

*Gonzalez v. Drew Indus.*, 750 F. Supp. 2d 1061 (C.D. Cal. 2007) ................................. 14

*Hewlett-Packard Co. v. Superior Court* ("*Rutledge*"), 167 Cal. App. 4th 87 (2008) .......... 11, 12

*Hoey v. Sony Elecs. Inc.*, 515 F. Supp. 2d 1099 (N.D. Cal. 2007) ................................. 24

*Hornberger v. General Motors Corp.*, 929 F.Supp. 884 (E.D. Pa. 1996) ....................... 11

*Horvath v. LG Elecs. MobileComm U.S.A., Inc.*, 2012 U.S. Dist. LEXIS 19215 (S.D. Cal. Feb. 13, 2012) ....................................................................................... 11, 21

*In re Apple In-App Purchase Litig.*, 2012 U.S. Dist. LEXIS 47234 (N.D. Cal. Mar.

31, 2012) ...........................................................................................................24

*In re Sony VAIO Computer Notebook Trackpad Litig.*, 2010 U.S. Dist. LEXIS
115142 (S.D. Cal. Oct. 27, 2010)...........................................................11, 12

*Kas v. Mercedes-Benz USA, LLC*, 2011 U.S. Dist. LEXIS 127581 (C.D. Cal. Oct.
31, 2011) ...................................................................................................14

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939 (2002) ...................................................15

*Keegan v. Am. Honda Motor Co*, 2012 U.S. Dist. LEXIS 3007 (C.D. Cal. Jan. 6,
2012) .........................................................................................................14

*Keegan v. Am. Honda Motor Co*, 838 F. Supp. 2d 929 (C.D. Cal. 2012)...........12, 14

*Klein v. Earth Elements, Inc.* (1997) 59 Cal.App.4th 965 (1997) ............................15

*Kowalsky v. Hewlett-Packard Co.*, 2011 U.S. Dist. LEXIS 89379 (N.D. Cal. Mar.
14, 2012) ...............................................................................................16, 18

*LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997) ...........................................20

*Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115 (2007) ...............15

*Long v. Hewlett-Packard Co.*, No. 06-02816, 2007 U.S. Dist. LEXIS 79262 (N.D.
Cal. July 27, 2007) ...................................................................................19

*Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990)........................................24

*Marsikian v. Mercedes Benz USA, LLC*, No. CV 08-04876 AHM (JTLx), 2009
U.S. Dist. LEXIS 117012 (CD. Cal. May 4, 2009) ..........................................23

*Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297 (2009)........................................13

*Music Acceptance Corp. v. Lofing*, 32 Cal. App. 4th 610 (1995)............................12

*Nagel v. Twin Laboratories, Inc.*, 109 Cal.App.4th 39 (2003) ..................................15

*National R.V., Inc. v. Foreman*, 34 Cal. App. 4th 1072 (1995) ..................................12

*O'Shea v. Epson Am., Inc.*, 2011 U.S. Dist. LEXIS 85273 (C.D. Cal. July 29,
2011) .........................................................................................................22

*Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964 (N.D. Cal. 2008)........................19

*Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517 (9th Cir. 1994) ........................9

*Peviani v. Natural Balance, Inc.*, 774 F. Supp. 2d 1066 (S.D. Cal. 2011) ..................19

*Plasencia v. Lending 1st Mortgage*, 259 F.R.D. 437 (N.D. Cal. 2009)........................24

*Pollard v. Saxe & Yolles Dev. Co.*, 12 Cal.3d 374 (1974) ......................................14

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .........................................................9

*Schnall v. Hertz Corp.*, 78 Cal.App.4th 1144 (2000).............................................15

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986) ..................25

*Shein v. Canon U.S.A., Inc.*, No. CV 09-00398 AHM, 2010 U.S. Dist. LEXIS
91160 (C.D. Cal. Aug. 10, 2010) ...................................................................25

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997)........................18

*Stearns v. Select Comfort Retail Corp.*, 763 F.Supp.2d 1128 (N.D. Cal. 2010)........................14

*Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123 (N.D. Cal. 2010)........................24

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003) ........................9

*Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213 (2010) ...............................10

*Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. Cal. 2008) .....................................17, 19

*Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. Cal. 2012) ..................................21, 23

*Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010) ..................11

**STATUTES**

Cal. Bus. & Prof. Code § 17500 ...........................................................................................15

Cal. Bus. Prof. Code § 17200................................................................................................15

Cal. Civ. Code § 1791(a) ......................................................................................................12

Cal. Civ. Code § 1792 ..........................................................................................................12

Cal. Com. Code § 2313(1)(a-b) ...........................................................................................10

Cal. Com. Code § 2607(3)(A)...............................................................................................14

Fed. R. Civ. P. 9(b) ..............................................................................................................16

1    Plaintiff respectfully submits this Opposition to Defendant's Motion to Dismiss Plaintiff's

2    Second Amended Complaint.  (Dkt.# 30.)

3    **I.      INTRODUCTION**

4        On October 11, 2012, this Court granted Defendant Hewlett-Packard's ("Defendant" or

5    "HP") motion to dismiss and dismissed, with leave to amend, all of Plaintiff's claims.  *See Elias*

6    *v. Hewlett-Packard Co.*, 2012 U.S. Dist. LEXIS 146811 (N.D. Cal. Oct. 11, 2012).  It held:

7        <u>Warranty Claims</u>:  Plaintiff did not adequately allege that a defect had become manifest
8        during the one-year limited warranty period.  Plaintiff also did not sufficiently allege a
         "latent" defect because he did not explain how the defect was "substantially certain" to
9        result in malfunction.  Plaintiff also did not adequately allege breach of implied warranty
         because he did not allege that the defect was significant or common enough to render the
10       computers unfit for their ordinary purpose at the time of sale.

11       <u>Fraud-Based Claims</u>:  Plaintiff failed to adequately allege any affirmative
12       misrepresentations about the specific power characteristics or components of the
         computers, and the statements he cited were puffery. With regard to omissions, because
13       HP was a mere manufacturer, Plaintiff failed to establish that it had any affirmative duty
         to disclose anything other than safety issues, and he failed to allege sufficient facts to
14       establish that the computers were unsafe. Plaintiff also failed to allege reliance on any
         misrepresentations with particularity.
15

16   *Elias,* 2012 U.S. Dist. LEXIS 146811 at *10-39.

17       Unlike the FAC, Plaintiff's second amended complaint ("SAC") includes detailed

18   allegations addressing each of the above inadequacies, nearly all of which HP ignores in its

19   second motion to dismiss.  The SAC, for example, explains that Plaintiff's computer repeatedly

20   failed to operate during the first year—by overheating, seizing up, and/or randomly restarting—

21   and that these problems resulted directly from the inadequate power supply unit, not from what

22   the Court termed "ordinary troubleshooting."  It also explains in detail why such results are

23   substantially certain to occur when the power supply unit is inadequate, and why the inadequacy

24   renders the computer unfit for its ordinary purpose.

25       The SAC also contains detailed additional allegations about HP's misrepresentations,

26   omissions and duty to disclose.  Most importantly, it narrows the proposed class to those persons

27   who, like Plaintiff, *customized and purchased their computers directly through HP's website*,

28   rather than purchasing from a third-party retailer.  This means that HP was not merely the

1    "manufacturer" who made generic misrepresentations about the "power" of its Slimline and

2    Pavilion computers, but was directly inducing Plaintiff and class members to purchase upgraded,

3    high-performance components, in specific "recommended configurations," even though the

4    components *were not compatible* and caused the computers to malfunction.  Plaintiff further

5    asserts that he specifically read, and relied on, all of HP's marketing statements about the

6    functionality—including multitasking and gaming—of his computer and the upgraded video card

7    HP offered, and that he never would have paid for the upgraded card, or bought the computer at

8    all, had he known that the power supply was inadequate and that configuring the computer as HP

9    recommended would decrease the computer's performance, life-span and safety.

10         Interestingly, HP appears to agree that its practices were improper.  As noted in the SAC,

11   with other models of computers sold through the website, it *prevented* customers from upgrading

12   their components unless they chose higher-capacity power supply units.  And after this suit was

13   filed, it appears to have stopped offering customers the option to select upgraded, power-hungry

14   components in the models at issue in the complaint.

15         HP's motion to dismiss essentially repeats the arguments from its prior motion, without

16   addressing the new allegations described above.  Worse, HP tries to misdirect the Court away

17   from Plaintiff's new allegations, by inventing alleged "admissions" that are nowhere found in the

18   SAC.  It states, for example, that Plaintiff "now" alleges that "his computer would **occasionally**

19   'freeze, restart and shut down' during the first year of use."  (Dkt.# 30, 1:14-15.) (emphasis

20   supplied.)   But nowhere has Plaintiff alleged that the inherent defect caused only "occasional"

21   problems.  It also contends that Plaintiff "does not allege that his safety was put at risk as a result

22   of his allegedly 'underpowered' computer."   (Id., 2:20-21.)  But this statement not only ignores

23   Plaintiff's exact detailed allegations to that effect; it also ignores that a "safety" risk is not

24   necessary for there to be a cause of action when either (1) the product fails within the express

25   warranty period, (2) the product is unfit for its ordinary purpose at the time of sale, or (3) the

26   seller makes other representations that create a duty to disclose.  All three situations exist here.

27   HP's motion to dismiss should be denied.

28

## II.     BACKGROUND AND ALLEGATIONS

On December 9, 2011, Plaintiff filed a class action complaint against HP, in the Superior Court of California for the County of Santa Clara, alleging, *inter alia*, that it knowingly sold computers with inadequate power supplies.  (Dkt.## 1-2.)  Plaintiff later filed a first amended complaint ("FAC").  (Dkt.## 1-3.)  He alleged six causes of action, all under California law: (1) violation of the Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*; (2) violation of California's False Advertising Law ("FAL"), California Business and Professions Code §§ 17500, *et seq.*; (3) fraud; (4) breach of express warranty pursuant to California Commercial Code §§ 2313, *et seq.*; (5) violation of the Song-Beverly Consumer Warranty Act, Civil Code §§ 1790, *et seq.*; and (6) violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*

HP moved to dismiss the FAC based on Federal Rules of Civil Procedure 12(b)(6) and 9(b).  (Dkt.# 11.)   On October 11, 2012, the Court dismissed, with leave to amend, all of Plaintiff's claims.  *See Elias,* 2012 U.S. Dist. LEXIS 146811 at *40.

With regard to Plaintiff's warranty claims, the Court held that he had not adequately alleged that (1) an inherent defect was "substantially certain" to result in malfunction (id. at *14, 17), (2) a "likelihood" that the wattage difference between the power supply and the graphics card would lead to malfunction (id. at *17), (3) his computer failed to work properly from the outset (id. at *20), or (4) the alleged problems are significant or common enough to render the computers "unusable and unsalable" at the time of sale or unfit for its ordinary purpose (id. at *21-22).

The Court then separately analyzed HP's alleged misrepresentations and omissions under Plaintiff's UCL, CLRA, FAL and fraud claims.  The Court held that the alleged misrepresentations—i.e., "ultra-reliable performance," "full power and performance," "versatile, reliable system," "delivers the power you need" or "packed with power"—were "non-actionable puffery," because they (1) "say nothing about the specific characteristics or components of the computer" and (2) do not "contain or even suggest any factual representations about the wattage provided by the power supply or the wattage recommended for various components."  *Id*. at *27-

29.   The Court thereby found that a "reasonable consumer could not rely on these statements as describing the specific power capabilities of a Slimline or Pavilion computer." *Id*. at *28. Finally, with regard to the alleged omissions, the Court held that HP did not have a duty to disclose the increased risk of fire because Plaintiff had not established "a sufficient nexus between the alleged defect and safety hazard." *Id*. at *34.

On October 22, Plaintiff filed a second amended complaint adding allegations to support all of his causes of action.  (Dkt.# 29.)   Regarding his warranty claims, Plaintiff now alleges, throughout the SAC, that the defect was inherent, certain to manifest itself and, as such, that the HP computers were unusable, unsalable and unfit for their ordinary purpose.   He also alleges that, during the one-year term of his express warranty, his computer malfunctioned due to the inherent defect.  He states as follows:

> In the months following the computer purchase, and well before the end of the first year of ownership, Plaintiff's computer began to randomly freeze, restart or shut down.  At the time, Plaintiff did not know what was causing the problems. In November 2011, the computer ceased working entirely and could not be restarted.  Plaintiff brought the computer in for repairs and learned that the power supply was defunct and that the motherboard had shorted out.  He subsequently learned that the wattage rating of the included power supply was well below what was needed or recommended to run the computer configuration that he had selected through the HP website at the time of purchase, and that the inadequacy of the power supply unit had caused his problems.

> * * *

> The use of inadequate power supplies means that the power supply unit will be running at its maximum capacity for long periods of time, generating substantial heat, putting undue stress on, and leading to premature failure of, cooling fans and the power supply unit itself.  As a result, Defendant's computers at issue in this case, including Plaintiff's, suffered from problems that would not otherwise occur, including failing to boot, freezing, and randomly restarting.  As explained by Advanced Micro Devices ("AMD"), which supplies a substantial percentage of the processors incorporated into Defendant's computers (including the ones incorporated in the computer Defendant sold to Plaintiff):

>> The power supply is the single most important component in a system because it provides the necessary power to allow all other hardware to work. A defective or inadequate power supply can cause the system to experience:

>> • System instability: No boot, random reboots or hangs
>> • Performance instability: Random application crashes or hangs
>> • Display corruption: Dots, lines, flashes on the screen
>> • Display Abnormality: Additional monitor(s) in a multi monitor

setup does not work or randomly stops working.

http://support.amd.com/us/kbarticles/Pages/powersupplysysteminstability.aspx, last visited October 22, 2012. Plaintiff's computer suffered from all of the listed problems with system and performance instability, beginning well within the first year of ownership.

* * *

None of these malfunctions, including the random freezing, restarting and shutting down, are symptoms of a normally functioning computer. Rather, they are symptoms of the inherent defect: failing to include adequate power supplies to run the computers and upgraded components that HP advertised, marketed and sold as being compatible and customizable, and that HP itself installed into the computers. The defects were substantially certain to occur under normal use, because the normal use of the computers and their included components (particularly for graphics and multitasking) would require power in excess of what could be supplied by the power sup[p]ly unit.

The defect in the computers was not apparent at the time of purchase, because HP failed to disclose (1) the power requirements of the included components, (2) the component manufacturers' power recommendations, or (3) the fact that the rating of the included power supply was less than the required or recommended power needs.

* * *

Even if the components can be operated for some period of time with the wattage provided by the included power supply unit, their use will inherently overtax the power supply unit and will be substantially certain to result in the malfunctions described in this complaint, even when the computers are operated under normal conditions, and well within the first year of operation. If, for example, the customer chooses one of the upgraded graphics cards (as did Plaintiff) and then uses the computer to run graphics-rich programs for which the card is designed (as did Plaintiff), the inadequate power supply is likely to cause the computer to randomly freeze, restart or shut down (as did Plaintiff's). The likelihood of such malfunctions will increase if the computer is being used for multitasking, so that multiple components (for example, the graphics card and DVD drive) are being used simultaneously. For this reason, the manufacturers of the components recommend much larger power supply units than Defendant supplied, although Defendant neglected to so inform consumers.

* * *

Defendant's computers, given their inadequate power supplies, could not and would not function properly under normal use, within the first year of operation. Rather, they would (and in Plaintiff's case, did) randomly freeze, restart, and shut down during that period. In normal operation, they were also substantially more likely to (and in Plaintiff's case, approximately 17 months after purchase, did) overheat, result in total failure of the power supply unit, and cause shorting out and melting of the central processing unit, rendering it inoperable. Finally, because of voltage fluctuations caused by the inadequate power supply, the computers were substantially more likely catch fire, creating a significant safety hazard.

* * *

Because of the inadequate power supplies, Defendant's computers at issue in this litigation, including Plaintiff's, were also much more likely to overheat, short out, melt

and catch fire, creating a significant safety risk.  This is because, among other things, an overloaded or overheated power supply is more likely to send voltage surges through the computer.  *See* http://askbobrankin.com/replace_your_power_supply.html, last visited October 22, 2012.  Plaintiff's computer shorted out and melted approximately 17 months after purchase, although the result easily could have occurred within the first year of ownership, especially if the computer had been used more frequently or for longer periods of time.

* * *

Because Plaintiff's computer had an inadequate power supply to operate the upgraded components, his computer underperformed, froze, overheated, and eventually caused permanent damage to the central processing unit and a complete loss of his computer. The problems of random freezing, restarting and shutting down all began to manifest well within the first year of operation.

* * *

These problems would have been avoided had Defendant disclosed that the power supply unit was insufficient (or less than recommended by manufacturers) to operate the graphics card and other components that Plaintiff selected from the list of options at the time of purchase, because in that case Plaintiff would not have made his purchase.

(Dkt.# 29, ¶¶ 2-4, 19, 22, 32-33, 81-82, 91.)

In conjunction with his UCL, FAL, CLRA and fraud claims, Plaintiff also added detailed allegations regarding HP's actionable misrepresentations and omissions and his reliance thereon. For example, he pleads, throughout his SAC, that HP affirmatively marketed and advertised enhanced, high performance, souped up computers and components by offering customers the option to customize the computer before purchasing it through the website.  HP called these upgrades a "recommended configuration" which at least implied if not outright represented that the computer's included power supply would be adequate to power the upgraded computer/components, particularly as HP did not provide an option (unlike with other models) to select a larger power supply.  (Id., ¶¶ 1, 3, 31.)  Plaintiff specifically states the following:

Defendant…advertised an upgraded or "recommended configuration," thereby specifically marketing and advertising computers with faster, higher performance, more powerful and/or upgraded components.  For most of the different computer components, Defendant further marketed and advertised a menu of various customizable options, typically ranging from more basic to more powerful, higher performance components.

Defendant marketed and advertised its HP Slimline s5t series with the graphics cards shown in left column of the table below.  As noted above, the Slimline computers are marketed and advertised with a 220-watt power supply.  On the right are the recommendations by the manufacturers of those cards (OEMs) for minimum power supply:

| Graphics Card Option | Manufacturer Recommended |
| --- | --- |

|  | Power Supply |
|---|---|
| Integrated graphics - Intel(R) HD graphics [DVI, VGA] | Presently unknown to Plaintiff |
| 512MB DDR3 AMD Radeon HD 6450 [DVI, HDMI. VGA adapter] | 400W |
| 1GB DDR3 NVIDIA GeForce GT520 [DVI, HDMI, VGA adapter] | 300W |
| 1GB DDR3 AMD Radeon HD 6450 [DVI, HDMI. VGA adapter] | 400W |

[W]hen customers, including the Plaintiff, were in the process of purchasing computers with faster, higher performance, more powerful and/or upgraded components, Defendant affirmatively marketed and advertised that its Slimline and Pavilion computers would have sufficient power to operate the touted optional customizable components.  HP's website stated that the Pavilion computers provide were for "Everyday computing.  **Ultra-reliable performance** delivered in a classic desktop PC.  **Packed with everything you need for the internet, email, entertainment** and more." It also described the Slimline computers as "Slim and sleek:  Slim, sleek, space-saving PCs **deliver full power and performance** without a towering presence."  *Id*.  Only after viewing these screens was the consumer (including Plaintiff) able to choose the customization options.   No warning was given that, if optional higher performance components are selected, the computers would no longer have "ultra-reliable performance" or "full power" to run those components.  Nor was any warning given that selecting the optional, higher performance components would necessarily (1) decrease the computer's performance, efficiency, life-span and (2) increase its safety hazards.

[W]hen consumers (including Plaintiff) used the "Help me choose" interface on the HP website, they were told that the Slimline and Pavilion computers would meet their "computing needs" even after stating that those "computing needs" included "Multitasking: basic and everyday activities plus using several applications at the same time, **working with complex graphics and multimedia**" and that the computer was intended for "Business/Home office: you need to manage appointments, spreadsheets, **graphics-rich presentations**, and financial applications. **A versatile, reliable system with ample power so you can multitask and communicate with others is critical."**

[O]n HP's product page advertising each of the Slimline series (the s5t, s5xt and s5z), and the availability of the upgraded, high performance components, Defendant made the following statements:

> **Packing power** and style into your tightest spaces, this elegant design **is ideal for family entertainment**, productivity, homework, photos, **and games**.
>
> * * *
>
> **Compact but powerful.**  Don't let the size fool you—**this series delivers the power you need, easily handling multimedia and rich graphics.**
>
> * * *
>
> Enjoy high-def videos, quality sound, and more, **with . . .[o]ptional dedicated graphics card for pumping up images and multimedia**…

Defendant also affirmatively misstated that despite the small physical size of the Slimline computers, they would not suffer from any reliability or power problems. For example, as stated above, Defendant stated that the Slimline computers were "Compact but powerful.  Don't let the size fool you—this series delivers the power you need, easily handling multimedia and rich graphics."  These statements were false and misleading because the small physical size means there is inadequate space for either a standard-sized power supply unit or for sufficient air to flow between components.  These two inadequacies are mutually reinforcing, leading to high temperatures and added stress on the power supply unit, fans, central processor, and components.  The inadequacies are even more pronounced when customers select upgraded components such as graphics cards that require additional power and generate additional heat.  In fact, the Slimline computers at issue could not "easily handle multimedia and rich graphics."  To the contrary, the Slimline computers were less reliable and had shorter life spans and higher safety risks.

(Id., ¶¶ 3, 6, 16, 18, 20, 22-25, 31.) (citation omitted.)

Plaintiff further pleads that HP intentionally failed to disclose that the Slimline and Pavilion computers, as configured, have less power than needed to operate properly and less than recommended by the OEMs who supply the graphics cards and peripherals.  (Id., ¶ 1, 4, 18, 20, 32, 49, 65-69.)   Nor did HP provide to Plaintiff, and those similarly situated, any warning that a larger power supply unit could be needed for proper operation or that selecting the optional higher performance components would necessarily decrease the computer's performance, efficiency, and life-span and increase its safety hazards.  (Id., ¶¶ 22-25, 27, 32, 49, 65-69.)

Even if Plaintiff had not adequately alleged the existence of actionable affirmative misrepresentations and omissions, he has added allegations establishing that HP was obligated to (but did not) disclose the existence of a safety risk—i.e., fire—and  further explained exactly how a lack of sufficient power causes computers to catch fire.   He explains that the computers catch fire because "an overloaded or overheated power supply is more likely to send voltage surges through the computer" and that due to "voltage fluctuations caused by the inadequate power supply, the computers were substantially more likely catch fire, creating a significant safety hazard.  (Id., ¶¶ 3, 81.)  He also specifically alleges that the inherent defect eventually caused his computer to "overheat," resulting "in total failure of the power supply unit, and cause shorting out and melting of the central processing unit, rendering it inoperable," and that the "shorting out and melting" could easily have occurred in the first year of operation had he used the computer more frequently or for longer periods.  (Id., ¶¶ 3, 81.)

1    Finally, Plaintiff pleads that, during his June 10, 2012 purchase, on HP's website, he read

2 and relied on each of the above misrepresentations.  (Id., ¶¶ 7, 22-25, 30-32, 49.)   He pleads that

3 but for HP's misrepresentations and omissions, he would not have purchased the HP computer or,

4 at a minimum, he would not have accepted HP's invitation to include components that required

5 more wattage to function than his computer provided.  (Id., ¶¶ 56, 68-69, 71, 77, 99.)

6 **III.    ARGUMENT**

7    **A.    Legal Standard For Motion To Dismiss**

8    Under Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint

9 only if it fails to state a claim upon which relief can be granted.   A motion to dismiss should only

10 be granted if it appears beyond a doubt that the plaintiff "can prove no set of facts in support of

11 his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The

12 question is not whether a plaintiff will prevail in the action, but whether he is entitled to offer

13 evidence in support of its claim.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), overruled on

14 other grounds, *Davis v. Scherer*, 468 U.S. 183 (1984).

15    District courts are obligated to accept a plaintiff's allegations as true and construe them in

16 the light most favorable to plaintiff.  *Id*.  To survive a Rule 12(b)(6) motion, a complaint need not

17 contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief

18 that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also*

19 *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994) (courts must assume

20 that all general allegations "embrace whatever specific facts might be necessary to support

21 them"); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003) (at pleading

22 stage, plaintiffs "need only show that the facts alleged, if proved, would confer standing upon

23 him") (citations omitted).

24    **B.    Plaintiff Adequately Pleads Each Cause Of Action.**

25       **1.    Plaintiff Adequately Pleads A Breach of Express Warranty Under
26          California Law.**

27    HP first argues that Plaintiff cannot plead breach of express warranty because his

28 computer did not "malfunction" until after the limited warranty period expired.   In making this

1  argument, HP ignores all of Plaintiff's amended allegations.   As discussed above, Plaintiff

2  repeatedly pleads that, due to the inherent defect, his computer malfunctioned ***during*** the one-

3  year warranty period by "randomly" freezing, restarting, and shutting down.  (Dkt.# 29, ¶¶ 2-4,

4  19, 22, 27, 32-33, 81-82, 91.)  HP counters by quoting this Court's hypothesis that such

5  malfunctions are "regular occurrences when trouble shooting computers," and by stating that it

6  never promised "perfect" or "uninterrupted use."  These arguments are premature as well as

7  legally and factually incorrect.  *See Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227

8  (2010) (quoting Cal. Com. Code § 2313(1)(a-b), establishing standard for pleading breach of

9  express warranty).

10  First, Plaintiff specifically states that the malfunctions that he experienced were *not* the

11  type of commonplace, regular problems that might be expected from any computer.   He states:

12  "None of these malfunctions, including the random freezing, restarting and shutting down, are

13  symptoms of a normally functioning computer.  Rather, they are symptoms of the inherent defect:

14  failing to include adequate power supplies to run the computers and upgraded components that

15  HP advertised, marketed and sold as being compatible and customizable, and that HP itself

16  installed into the computers."  (Id., ¶ 82.)  He further alleges that the "defects were substantially

17  certain to occur under normal use, because the normal use of the computers and their included

18  components (particularly for graphics and multitasking) would require power in excess of what

19  could be supplied by the power supply unit."[1]  (Id.)

20  Second, while it is true that HP did not promise "perfect" or "uninterrupted use," it did

21  promise that Plaintiff's computer would be "free from defects in materials or workmanship under

22  normal use."  (Id., ¶ 79.)  Plaintiff adequately alleges that HP violated this promise.  (Id., ¶ 81

23  ("Defendants' computers, given their inadequate power supplies, could not and would not

24  function properly under normal use, within the first year of operation.  Rather, they would (and in

25  Plaintiff's case, did) randomly freeze, restart, and shut down during that period.").)) While HP

26  may ultimately try to establish that Plaintiff's use was abnormal and/or that the experienced

27

28  [1] In quoting from the SAC, Plaintiff has corrected several typographical errors.

1   malfunctions were normal or to be expected—*i.e.,* not caused by the alleged defect—those

2   questions may not be adjudicated on a motion to dismiss.[2]

3       HP next suggests that Plaintiff's breach of warranty claims fails because his computer was

4   still "functional" or "operable" during the limited warranty period.[3]  Otherwise put, HP argues

5   that "malfunction" alone is insufficient to establish a breach of warranty; rather, it suggests that

6   total inoperability is the standard.  This argument fails because it is contrary to HP's express

7   warranty, which nowhere requires complete inoperability.  Indeed, HP admits that the warranty

8   requires just a "manifestation of any defect."  (Dkt.# 30, 5:22.)   HP also fails to provide any

9   authority to support its elevated standard.  Nor could it, because none exists.[4]

10  _____

11  [2] *See, e.g., Hewlett-Packard Co. v. Superior Court* ("*Rutledge*"), 167 Cal. App. 4th 87, 96 (2008)
    (holding that the question of whether a defect is "substantially certain to result in malfunction

12  during the useful life of the product" is a merits question, requiring evidentiary inquiry, and did
    not require proof that the product had "actually failed."); *Wolin v. Jaguar Land Rover North

13  America, LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (holding, in context of certification, that
    plaintiffs did not need to demonstrate that alleged defect in their vehicles was "substantially

14  certain to manifest in a future malfunction."); *Horvath v. LG Elecs. MobileComm U.S.A., Inc.*,
    2012 U.S. Dist. LEXIS 19215 at *21 (S.D. Cal. Feb. 13, 2012) (denying motion to dismiss where

15  plaintiffs alleged that cell phone shuts down, freezes, does not work unless a consumer repeatedly
    removes and replaces the battery, because plaintiffs alleged facts to make their claim for breach

16  of warranty above the speculative level); *Kas v. Mercedes-Benz USA, LLC*, 2011 U.S. Dist.
    LEXIS 127581 (C.D. Cal. Oct. 31, 2011) (holding that addition of allegations that "kicking,

17  jerking, delayed acceleration, etc." occurs "when her vehicle, during normal operation, suddenly

18  and unexpectedly pulls back (*i.e.*, jolts), hesitates, and then takes off like a slingshot" sufficient to
    plead breach of warranty); *In re Sony VAIO Computer Notebook Trackpad Litig.*, 2010 U.S. Dist.

19  LEXIS 115142 at *7-9 (S.D. Cal. Oct. 27, 2010) (denying motion to dismiss where defendant

20  argued, like here, that the alleged defect was a software problem and it did "not preclude the use
    of the notebook for its intended purpose," stating that defendants' arguments "require the Court to

21  view Plaintiffs' complaint in the light most favorable to *Defendants,* rather than *Plaintiffs,* ignore
    allegations, and go beyond the allegations of Plaintiffs' complaint") (emphasis in original);

22  *Hornberger v. General Motors Corp.*, 929 F.Supp. 884, 888 (E.D. Pa. 1996) ("[A] material
    question of fact does exist as to whether a normal transmission of a newly leased vehicle would

23  fail after being driven approximately 40,000 miles, rendering the car unfit for the purpose of

24  driving and, therefore, unmerchantable.")

25  [3] Defendant expands this argues by claiming that the "operability" of Plaintiff's computer during
    the warranty period is proved by the fact that Plaintiff did not take his computer in for repair

26  during the warranty period.  This proves nothing.  The computer was indisputably inoperable
    when it was frozen or shut down.  In any event, Plaintiff alleges that, "[a]t the time, [he] did not

27  know what was causing the problems."  (Dkt.# 29, ¶ 33.)

28  [4] *See, e.g., Daugherty v. American Honda Motor Co., Inc.,* 144 Cal.App.4th 824, 831–832 (2006)
    (holding a "breach of warranty requires a malfunction during its useful life."); *Decker v. Mazda*

Finally, in its Order, the Court noted that "it is unclear whether the defect was even 'inherent,' given that Plaintiff opted to include the particular graphics card in his computer." *Elias,* 2012 U.S. Dist. LEXIS 146811 at *17. This concern is addressed in the SAC, wherein Plaintiff makes clear that all computers were bought directly from HP, through the HP website, and that HP affirmatively sold the card as part of a "recommended configuration" and walked Plaintiff through the upgrade process. Thereby, HP (not Plaintiff or class members) created the defect that was inherent to the computers it marketed, advertised and sold.

### 2. Plaintiff Adequately Pleads Violation of Implied Warranty Under California's Song-Beverly Act.

The Song-Beverly Consumer Warranty Act ("Song-Beverly Act") was enacted to regulate warranties and strengthen consumer remedies for breaches of warranty. *See National R.V., Inc. v. Foreman*, 34 Cal. App. 4th 1072, 1077 (1995). The act is intended to protect purchasers of "consumer goods," defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables." Cal. Civ. Code § 1791(a).[5]

---

*Motor of Am., Inc.*, 2011 U.S. Dist. LEXIS 124182 (C.D. Cal. Oct. 24, 2011) (denying motion to dismiss breach of warranty where plaintiff alleged a "Crank No Start" defect, which is a "condition wherein the Class Vehicle may have difficulty starting" when either the engine is cold from short distance driving or when the clutch is misapplied); *Keegan v. Am. Honda Motor Co,* 838 F. Supp. 2d 929 (C.D. Cal. 2012) (holding car owners had sufficiently stated a warranty claim against manufacturer where they had adequately alleged safety defect in the rear suspension that led to unexpected tire wear, not total inoperability); *Rutledge*, 167 Cal. App. 4th at 95 (where HP had marketed and distributed Pavilion series notebook computers, knowing that the computers had defective inverters that could potentially cause dim displays, stating "we are not persuaded by HP's reliance on *Daugherty* for its position that a product malfunction is required in order for the product to be considered defective."); *In re Sony VAIO Computer Notebook Trackpad Litig.*, 2010 U.S. Dist. LEXIS 115142, at *10 (rejecting defendant's argument that warranty claim failed where track pad defect did not render computer inoperable because computer could still be used with external mouse).

[5] Unless specific disclaimer methods are followed, an implied warranty of merchantability accompanies every retail sale of consumer goods in the state. *See* Cal. Civ. Code § 1792; *see also Music Acceptance Corp. v. Lofing*, 32 Cal. App. 4th 610, 619 (1995). Although HP again argues in passing that it merely warranted the computer to be "free from defects in materials and workmanship," it did not comply with the disclaimer requirement, so the implied warranty applies. *See Brothers v. Hewlett-Packard Co.*, 2007 U.S. Dist. LEXIS 13155 at *24-25 (holding that HP did not expressly disclaim any warranties other than those contained in its "Limited Warranty"). In *Brothers*, the court stated:

1    HP again argues that Plaintiff's Song-Beverly claim is time-barred, because the computer

2   did not malfunction until more than a year after the purchase.  HP falsely writes that "[a]ccording

3   to Plaintiff's own allegations, the computer did not malfunction until five months after the one-

4   year limited warranty period expired."   Repetition alone does not render this argument true.  (*Cf.*

5   Dkt.# 29, ¶¶ 27 ("random freezing, restarting and shutting down all began to manifest well *within*

6   *the first year of operation*"), 33 ("*In the months following the computer purchase*, and well before

7   the end of the first year of ownership, Plaintiff's computer began to randomly freeze, restart or

8   shut down"), 81 ("could not and would not function properly under normal use, *within the first*

9   *year of operation*").)

10    HP next claims that Plaintiff was obligated to contact HP, and take his computer to an

11   authorized representative for repair, during the limited warranty term.  There is, however, no such

12   legal requirement.  *See Mexia v. Rinker Boat Co*., 174 Cal. App. 4th 1297, 1310 (2009) ("There is

13   nothing that suggests a requirement that the purchaser discover and report to the seller a latent

14   defect within [the one-year] time period.").   All that is required is that plaintiff give notice a

15   "reasonable time after discovery of the breach."   *See Alvarez v. Chevron Corp.*, 656 F.3d 925,

16   932 (9th Cir. 2011) *quoting Stearns v. Select Comfort Retail Corp.*, 763 F.Supp.2d 1128, 1142

17   (N.D. Cal. 2010) (citations omitted) and *citing* Cal. Com. Code § 2607(3)(A); *Stearns*, 763

---

18   
19    In California, "[s]trict construction against the person who has both warranted a particular
fact to be true and then attempted to disclaim the warranty is especially appropriate in
20   light of the fact that [a] disclaimer of an express warranty is essentially contradictory." In
*Fundin [v. Chicago Pneumatic Tool Co.,* 152 Cal. App. 3d 951, 957 (1984)], the court
21   held that the manufacturer's express warranties in its sales brochure could not be
disclaimed or excluded. The court reasoned that "when a product has been expressly
22   described by its manufacturer as having certain detailed capacities under certain
conditions, it would be both unfair and unreasonable to construe the language [of the
23   disclaimer] as negating the express description."  The court further reasoned that
interpreting the disclaimer as excluding the description of the product specification would
24   be particularly unfair where the consumer is unclear of what comprises the "standard
warranty." In *Fundin*, the disclaimer was stated in the sales brochure immediately
25   following the product description. Here, the disclaimer is within the standard warranty
itself. Nevertheless, the court's reasoning that allowing the disclaimers to exclude a
26   manufacturer's express representations of product specifications would be unfair is
equally applicable here.

27   *Id.*, 2007 U.S. Dist. LEXIS 13155, at *24-25 (internal citation omitted).

28

1   F.Supp.2d at 1142-43 ("A buyer also must plead that notice of the alleged breach was provided to

2   the seller within a reasonable time after discovery of the breach"); *Pollard v. Saxe & Yolles Dev.*

3   *Co.*, 12 Cal.3d 374, 380 (1974) ("The requirement of notice of breach is . . . designed to allow the

4   defendant opportunity for repairing the defective item, reducing damages, avoiding defective

5   products in the future, and negotiating settlements"); *see, e.g., Keegan,* 838 F. Supp. 2d at 952-

6   953 (concluding that plaintiff had adequately pled claim under Song-Beverly Act regarding

7   undisclosed rear suspension defect and that plaintiff's failure to plead specific date he learned of

8   tire wear caused by defect was not cause for dismissal).[6]  In any event, Plaintiff provided notice

9   before filing suit.  (Dkt.# 29, ¶ 85.)   The case relied upon by HP—*Gonzalez v. Drew Indus.,* 750

10  F. Supp. 2d 1061 (C.D. Cal. 2007)—actually rejected HP's argument here as "unavailing"

11  because plaintiff there gave notice of the alleged defect on the same date of the filing of the

12  complaint. *Id.* at *34-35.  Here, Plaintiff provided HP with notice well in advance of filing a

13  complaint, but it still refused to "replace the computer or even agree to repair it."  (Dkt.# 29, ¶

14  85.)  Whether or not Plaintiff's notice was reasonable is for a jury to decide.  *See Keegan,* 838 F.

15  Supp. 2d at 951 ("Whether or not notice was given within a reasonable time, however, is a fact

16  question that cannot be determined in the context of a motion to dismiss.").

**3.     Plaintiff Adequately Pleads Violations of the UCL, FAL, CLRA and Fraud.**

19          To state a claim under the UCL, FAA, or CLRA, Plaintiff need not plead an "actionable

20  [6] Indeed, "[u]ndisclosed latent defects … are the very evil that the implied warranty of
merchantability was designed to remedy." *Id.* at 1305 (internal citation omitted); *accord Ehrlich*
21  *v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908 (C.D. Cal. 2010) (following *Mexia*); *Keegan v. Am.
Honda Motor Co*, 2012 U.S. Dist. LEXIS 3007, *49-50 (C.D. Cal. Jan. 6, 2012) (holding "Under
22  applicable law, [plaintiff's] failure to discover the defect within the one-year statutory period does
not defeat his claim at this stage of the litigation."); *Kas v. Mercedes-Benz USA, LLC*, 2011 U.S.
23  Dist. LEXIS 127581 (C.D. Cal. Oct. 31, 2011) (following *Mexia*); *Brittalia Ventures v. Stuke
Nursery Co., Inc*., 153 Cal. App. 4th 17, 24 (2007) (accord); *Berenblat v. Apple, Inc.*, 2009 U.S.
24  Dist. LEXIS 80734 (N.D. Cal. Aug. 21, 2009) ("claim brought under the Commercial Code must
be brought within four years of when the cause of action accrued, which in the case of a latent
25  defect occurs at the time of sale…[plaintiffs] are required to bring a claim for breach of the
implied warranty of merchantability within four years of the time of sale...."); *see also Alvarez v.
26  Chevron Corp.*, 656 F.3d 925, No. 09-56698, 2011 U.S. App. LEXIS 18211, *5 (9th Cir. Sept. 1.
2011) ("In California, a plaintiff may plead reasonable notice by alleging that she contacted the
27  defendant before bringing the lawsuit."); *see also Aaronson v. Vital Pharmaceuticals, Inc.*, 09—
CV—1333 W(CAB), 2010 U.S. Dist. LEXIS 14160, *5 (S.D. Cal. Feb. 17, 2010) ("In claims
28  against a manufacturer of goods, however, California law does not require notice.").

misrepresentation," but only that Defendant's actions, statements and omissions were likely to deceive a reasonable consumer. *See, e.g., Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 679 (2006), *quoting Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002) ("Section 17500 has been broadly construed to proscribe 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."); *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360 (2003) (conduct that is "likely to mislead a reasonable consumer" violates the CLRA); *Nagel v. Twin Laboratories, Inc.*, 109 Cal. App. 4th 39, 54 (2003) (same); *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1167 (2000) ("[t]he 'fraud' prong of [the UCL] is unlike common law fraud or deception…. [I]t is only necessary to show that members of the public are likely to be deceived.'").  Plaintiff can also make out a claim under the UCL without showing any deceptive conduct whatsoever, if he pleads that defendant's conduct was "unlawful" (in that it violated another statute) or "unfair" (in that it was a sharp or unconscionable practice). *See* Cal. Bus. Prof. Code § 17200; *People v. Servantes,* 86 Cal. App. 4th 1081, 1087 (2001) ("An unlawful business practice within the meaning of [the UCL] is one that is forbidden by law, whether civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made.");[7] *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999) ("unfair" business practice is actionable under UCL even if it is not "deceptive" or "unlawful"); *Klein v. Earth Elements, Inc.*, 59 Cal. App. 4th 965, 970 (1997) ("In general the 'unfairness' prong has been used to enjoin deceptive or sharp practices.").

Having described the false statements, the omissions, and the fact that he and other consumers were likely to be and were deceived, Plaintiff has stated all the elements of his consumer claims under California law. *See, e.g., Linear Technology Corp. v. Applied Materials, Inc.,* 152 Cal. App. 4th 115, 134-135 (2007) (stating "a plaintiff need not plead the exact language of every deceptive statement; it is sufficient for [the] plaintiff to describe a scheme to mislead customers, and allege that each misrepresentation to each customer conforms to that scheme," and

1    that a plaintiff's allegations "may be based on representations to the public which are untrue, and

2    also those which may be accurate on some level, but will nonetheless tend to mislead or

3    deceive").

4         On his common law claims, to be "actionable," Plaintiff must plead (a) a false

5    representation, concealment, *or nondisclosure*; (b) intent, knowledge, recklessness, or negligence;

6    (c) justifiable reliance; and (d) resulting damage. *See Cadlo v. Owens-Illinois, Inc*., 125 Cal.

7    App. 4th 513, 519 (2004); *Engalla v. Permanente Medical Group, Inc*., 15 Cal. 4th 951, 974

8    (1997).  He has done so.

9         Furthermore, even with respect to the claims "sounding in fraud" that are subject to Rule

10   9(b), where the claim is one of fraud by omission, the pleading standard is lowered on account of

11   the reduced ability in an omission suit "to specify the time, place, and specific content" relative to

12   a claim involving affirmative misrepresentations. *See Falk v. General Motors Corp*., 780 F.

13   Supp. 2d 1088, 1099 (N.D. Cal. 2007).  And, as this Court has recently clarified, the heightened

14   pleading requirements do not apply to allegations of knowledge, intent, or "other conditions of a

15   person's mind."  *Kowalsky v. Hewlett-Packard Co.*, 2011 U.S. Dist. LEXIS 89379, at *8-9 (N.D.

16   Cal. Aug. 10, 2011)*, citing* Fed. R. Civ. P. 9(b).

17           a.       **HP Affirmatively Misrepresented The Upgraded Computers It
                      Advertised And Sold.**
18

19        In the Order, this Court analyzed together Plaintiff's UCL, FAL, CLRA and fraud claims.

20   The Court dismissed the "fraud based" claims because Plaintiff did not adequately plead

21   "affirmative misrepresentations in regard to the power supplies of the computers at issue."   He

22   has added additional misrepresentations, and tethered all of HP's misrepresentations to its sales

23   process; whereby, it ***directly*** advertised and sold, to its customers, upgraded, higher-powered,

24   customizable computers and components.  In that context, Plaintiff establishes exactly how HP's

25   statements regarding performance and power, in combination with its representations concerning

26   the customized upgrades and the included power supply unit, misled consumers into believing

27   that the advertised power supply would be adequate to fully power the computers, as upgraded.

28   While it remains true that some of HP's affirmative statements might be viewed as generalized or

1    vague, the Ninth Circuit has held that even those "statements…cannot be considered in isolation

2    because they contribute to the deceptive context of the advertising as a whole." *See Williams v.*

3    *Gerber Prods. Co.*, 552 F.3d 934, 939 n.3 (9th Cir. 2008). [8]

4         HP fails to address Plaintiff's revised allegations, including the context in which they

5    were made.   Instead, HP falsely claims that Plaintiff "adds only <u>one</u> new statement"—i.e., that

6    "HP advertised its Slimline series of computers as 'compact but powerful.'" (Dkt.# 30, 9:22-23.)

7    (emphasis in original.)   It then argues that this new allegation does not affect the Court's

8    previous finding.   It is completely untrue that Plaintiff added on only one new statement.   To the

9    contrary, Plaintiff added a great deal of new allegations and evidence concerning the nature of

10   HP's affirmative misrepresentations.[9]   (Dkt.# 29, ¶¶ 3, 6, 16, 18, 20, 22-25, 31.)

11        HP's discussion of the "compact but powerful" representation further illustrates how HP

12   ignores the new allegations in the SAC.   The entire representation was "Compact but powerful.

13   Don't let the size fool you—this series delivers the power you need, easily handling multimedia

14   and rich graphics."  (Dkt.# 29, ¶ 25.)  And, unlike the FAC, Plaintiff ties this misrepresentation

15   directly to the power supply and wattage recommended for various components.   He states:

16        These statements were false and misleading because the small physical size means there is
17        inadequate space for either a standard-sized power supply unit or for sufficient air to flow
         between components.   These two inadequacies are mutually reinforcing, leading to high
18

19   [8] Context—i.e., the HP upgrade sales process—is crucial to Plaintiff's SAC.  In that context,
     statements regarding power and performance were not "claim[s] which no reasonable consumer
20   would take as anything more weighty than an advertising slogan," rather, they were fundamental
     to a consumer's decisions to upgrade to more powerful computers and components.  *See*
21   *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1361 (2003).

22   [9] Moreover, as required by this Court, he specifically ties each misrepresentation to specific
     characteristics or components of the computer—i.e., the upgraded, higher-powered components—
23   as well as the wattage provided by the advertised, but not-upgradable, power supply unit.  (Id.)
     Plaintiff now pleads because HP was intentionally marketing and selling upgraded computers and
24   components, as "powerful," "performance," "more efficient," "enhanced," "powered," "faster,"
     "high performance," "full powered," "amply powered," "compact but powerful," and "packed
25   with power,"[9] it intentionally misled consumers into believing that the advertised power supply
     unit was adequate when HP knew it was not.   As set forth in the SAC, when a computer is
26   underpowered, and it overheats, freezes, restarts, shuts downs, reboots and suffers from system
     and performance instability, it is not, in fact, upgraded, powerful, enhanced, performance or
27   efficient.  To the contrary, it is less efficient, less powerful, and downgraded, all of which are
     "factual representations" that are sufficient to raise triable issues.  *See, e.g., Cook, Perkiss and*
28   *Liehe, Inc. v. Northern California Collection Service Inc.*, 911 F.2d 242, 246 (9th Cir. 1990).

temperatures and added stress on the power supply unit, fans, central processor, and components.  The inadequacies are even more pronounced when customers select upgraded components such as graphics cards that require additional power and generate additional heat.   In fact, the Slimline computers at issue could not "easily handle multimedia and rich graphics."  To the contrary, the Slimline computers were less reliable and had shorter life spans and higher safety risks.

(Id.)  He further explains that "The power supplies are too small and the cabinets are too small to expel the heat that big gaming video cards generate."  (Id., ¶ 29.)   Plaintiff can (and will) demonstrate that unlike HP's full powered computers, the computer it sold to Plaintiff could not handle multimedia or rich graphics.   To the contrary, running multimedia and rich graphics necessarily made the computer less efficient, less powerful and caused it to under or poorly perform, have a shortened life expectancy. and increase the safety risks due to overheating and potentially internal fires.  (Dkt.# 29, ¶ 65.) *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) ("misdescriptions of specific or absolute characteristics of a product are actionable.")[10]  HP fails to address any of these allegations.

The cases cited by HP in support of this argument are distinguishable.[11]  To begin, unlike

---

[10] This distinction, for example, formed the basis for the Court's holding in *Annunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1139-41 (C.D. Cal. 2005), upon which HP relies.  There, the court deemed as puffery statements that notebook computer was of "high quality," was "reliable," offered "high performance," and employed the "latest technology."  But it simultaneously sustained claims based on statements that the computers included "brand-name components" and were subject to the "most stringent quality control test" because those were specific factual allegations, which could be proved or disproved through discovery.  The distinction also led district courts to reject HP's "puffery" argument in two similar cases: *Kowalsky v. Hewlett-Packard Co.*, 2011 U.S. Dist. LEXIS 89379 (N.D. Cal. Aug. 10, 2011) (denying motion to dismiss where HP made representations concerning printer speed); *Waller v. Hewlett-Packard Co.*, 2011 U.S. Dist. LEXIS 145276 (S.D. Cal. Dec. 14, 2011) (holding "[a]utomatic, hands-free backup" of "all your important files the minute you plug in" to be actionable).

[11] In *Vitt*, plaintiff challenged Apple's advertising because it stated that the iBook G4 is "mobile," "durable," "portable," "rugged," "built to withstand reasonable shock," "reliable," "high performance," "high value," an "affordable choice," and an "ideal student laptop."  The Ninth Circuit agreed with the district court's holding that these statements were generalized, non-actionable puffery because they are "inherently vague and generalized terms" and "not factual representations that a given standard has been met."  *Id.*, at *4.  The Ninth Circuit further held that even if a statement like "durable" was a statement of fact, then in the context in which it was made it might mean only that the iBook G4 was capable of performing after being dropped, and did not necessarily mean that it would last for a particular number of years.  *Id.*  At a minimum, HP's power representations are different because (1) the products malfunctioned during the warranty period and (2) they are made the specific context of the power needed to run the upgraded computer and components, and, as such, are easily susceptible to proof by comparing the provided wattage with the wattage required by the included components such as graphics cards.

this case, defendants in those cases were typically manufactures, not both manufacturer and

retailer.  More fundamentally, these cases did not concern a specific sales process wherein

defendant was selling upgraded, higher-powered, customized computers and components, while

making specific representations regarding the wattage of the included power supply unit.  *Cf.,*

*e.g., Brothers v. Hewlett-Packard Co*., No. C-06-02254 RMW, 2006 U.S. Dist. LEXIS 82027, at

*7 (N.D. Cal. 2006) ("high performance" and "top of line" regarding a computer purchased from

Circuit City); *Long v. Hewlett-Packard Co*., No. 06-02816, 2007 U.S. Dist. LEXIS 79262, at *8

(N.D. Cal. July 27, 2007) ("reliable mobile computing solution" that could "do more on the

move" regarding computer with defective screen inverters sold); *In re Sony Grand Wega*, 758 F.

Supp. 2d at 1095 ("high quality" and "superior quality" regarding TV picture quality, purchased

from third parties); *Tietsworth v. Sears, Roebuck & Co*., 720 F. Supp. 2d 1123 (N.D. Cal. 2010)

(dismissing, in part, claims based on "designed and manufactured for years of dependable

operation" and "save you time by allowing you to do fewer, larger loads," but allowing other

claims to proceed for Whirlpool washing machines sold at Sears).

   *Oestreicher v. Alienware Corp*., 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008), a case cited

by this Court as exhibiting "virtually identical statements" furthers the distinction. In *Oestreicher*,

plaintiff alleged that defendant's computers had a design defect in the heat management system,

causing them to overheat.  In that context, the court found statements of product superiority based

on being "faster, more powerful, and more innovative than competing machines," "higher

performance," and having a "longer battery life" to be "non-actionable puffery." 544 F. Supp. 2d

at 973.   However, unlike here, Alienware made such statements generally about its computers,

and not in conjunction with offering customers a method to customize their computers while

directly purchasing them through the Alienware website.  Nor did Alienware provide detailed

factual descriptions of the upgraded computers and components.  When it comes to false

advertising, the context distinctions are fundamental.  *See Williams*, 552 F.3d at 939, fn. 3

(stating that "It is not difficult to choose statements, designs, and devices which will not

deceive"); *see also Peviani v. Natural Balance, Inc*., 774 F. Supp. 2d 1066 (S.D. Cal. 2011)

(stating that "while the other statements relied on by Plaintiff standing on their own may

constitute puffery," the statements contribute "to the deceptive context of the packaging as a whole").

### b.   HP's Actionable Omissions.

Under California law, there are four circumstances in which a failure to disclose can constitute fraud or deceit:

> (1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed.

*Collins v. eMachines*, 202 Cal. App. 4th 249, 255 (2011), rev. denied, 2012 Cal. LEXIS 1407 (Cal. Feb. 15, 2012), *citing LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).  Plaintiff alleges that HP deceived, by omission, him under all four circumstances.  (Dkt.# 29, ¶¶ 65-69.) Plaintiff states, for example, that:

> At no time did Defendant inform Plaintiff that the computer, as advertised and configured, would not properly function with a 220-watt power supply.  Nor did HP inform him that by choosing (and paying for) upgraded, higher performance components he would necessarily (1) decrease the computer's performance, efficiency, life-span and (2) increase its safety hazards, including the risk of it catching, or starting a, fire.   Indeed, Defendant even failed to inform Plaintiff that AMD, the manufacturer of the graphics card that Defendant offered and that he selected—the 512 MB ATI Radeon HD 4350—expressly recommended at least a "300 Watt or greater power supply (350 Watt for ATI CrossFireX™ technology in dual mode)."  To the contrary, by virtue of the fact that Defendant marketed and advertised, and he was able to select the above components and peripherals, Plaintiff was deceptively led by Defendant to believe that those components and peripherals would be fully functional with his computer, as configured with the included power supply, and that the computer as configured satisfied all OEM recommendations.

(Id., ¶¶ 32, 65.)   Plaintiff further alleges that the above "omissions were known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiff, and material at the time they were made.  They concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase his computer, as configured."  (Id., ¶ 66.)  HP does not address these allegations.   Plaintiff accordingly states UCL, CLRA and fraud causes of action.  *See Collins*, 202 Cal. 4th at 255; *see also Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123 (N.D. Cal. 2010) (omitted information about defect in washing machines that caused

1   consumers to pay large repair bills was material under CLRA);[12] *Horvath v. LG Elecs.*

2   *MobileComm U.S.A., Inc.*, 2012 U.S. Dist. LEXIS 19215 (S.D. Cal. Feb. 13, 2012) (denying

3   motion to dismiss based on actionable misrepresentations and omissions without regard to safety

4   concerns).

5          In the Order, this Court rejected Plaintiff's omissions theory because Plaintiff had not

6   alleged any actionable misrepresentations.  Citing *Daugherty*, 144 Cal. App. 4th at 835-838, it

7   further found that because Plaintiff had not alleged a malfunction during the warranty period, his

8   omissions theory was limited to HP's "warranty obligations absent either an affirmative

9   misrepresentation or a safety issue." As Plaintiff now pleads actionable misrepresentations and

10  malfunctions during the warranty period, his omissions theory is no longer subject to a safety

11  limitation.  In *Collins*, the California Court of Appeal held that the point of *Daugherty* was to

12  preclude claims for product defect where the claim was merely that the product "wears out or

13  breaks over time because of use"; such claims are "attempt an end-around the warranty laws."  In

14  *Daugherty*, for example, the alleged "engine defect…could cause an oil leak malfunction long

15  after the warranty expired," but the leak would never occur within the 3-year warranty period.

16  *Collins*, 202 Cal. App. 4th at 256.  In *Collins,* by contrast, the claim was that the computers had a

17  defective microchip that caused them to be susceptible to data corruption at any time, including

18  during the warranty period, and the defendant knew of the defect.  The court held that the claim

19  survived because it was "not a situation where the [micro]chip is complete and operational when

20  sold, but wears out or breaks over time because of use and [wear and tear]" but rather a situation

21  where the alleged defect "results from [computer hardware] logic that was never installed on the

22  chip, thus rendering the chip susceptible to corrupting data and failure to meet industry standards

23  the instant the chip was manufactured."  *Id.*  Likewise, here, the claim is that the customized

24  computers were underpowered when sold, the lack of power caused materials problems during

25  the limited warranty period, and HP knew of the problem.  *See also Baba v. Hewlett-Packard Co.*,

26  ───────────────────

27  [12] In *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012), the Ninth Circuit similarly
distinguished *Tietsworth*: "*Tietsworth*, however, is distinguishable "because the plaintiffs in that
case alleged that they began experiencing problems 'within the first months of purchasing the
28  Machine'—i.e., within the express warranty period."  *Wilson*, 668 F.3d at 1142, fn. 1.

No. C 09-05946 RS, 2010 U.S. Dist. LEXIS 59747 (N.D. Cal. June 16, 2010) (same); *O'Shea v. Epson Am., Inc.*, 2011 U.S. Dist. LEXIS 85273, at *24 n.7 (C.D. Cal. July 29, 2011) (noting *Baba* is distinguishable from *Daugherty*).

**c.     HP Had A Duty To Disclose The Safety Risk Associated With The Underpowered Computers It Advertised and Sold.**

Unlike the FAC, Plaintiff now states that "[b]ecause of the inadequate power supplies, Defendant's computers at issue in this litigation, including Plaintiff's, were also much more likely to overheat, short out, melt and catch fire, creating a significant safety risk."[13] (Id., ¶ 3.)  Plaintiff further explains that the computers catch fire because "an overloaded or overheated power supply is more likely to send voltage surges through the computer" and that "voltage fluctuations caused by the inadequate power supply, the computers were substantially more likely catch fire, creating a significant safety hazard.  (Id., ¶¶ 3, 81.)  Plaintiff also specifically alleges that the inherent defect caused his computer to "overheat," resulting "in total failure of the power supply unit, and cause shorting out and melting of the central processing unit, rendering it inoperable." (Id., ¶ 81.)

Defendant nevertheless still argues that Plaintiff's fraudulent omissions claim fails because he has not alleged a safety issue.   HP first contends that randomly freezing, restarting or shutting down cannot reasonably pose a safety threat.  It misses the point.  These malfunctions are not safety issues but *symptoms* of the safety issue—*i.e.*, of overheating and voltage fluctuations.

HP next claims that Plaintiff's additional allegations are "not enough" because Plaintiff provides "no explanation that links the alleged insufficient power" to "catching fire."  HP again ignores Plaintiff's detailed explanation regarding voltage surges, shorts, failed cooling fans, and insufficient airspace to dissipate heat. These allegations are more than sufficient.

Finally, Defendant argues that Plaintiff's safety concern is not actionable because his computer did not actually "catch fire."  Though true—his components merely "melted"—there is no legal difference between a computer melting and catching fire.  And though HP may desire the

---

[13] Plaintiff further alleges the following:

> HP [did not] inform him that by choosing (and paying for) upgraded, higher performance components he would necessarily…increase its safety hazards, including the risk of it catching, or starting a, fire. (Dkt.# 29, ¶ 32.)

standard to be physical harm (such as burns) or property damage (like a torched desk), there is no

such requirement under California law. *See, e.g., Elias*, 2012 U.S. Dist. LEXIS 146811 at \*34

(sufficient to state "how the defects at issue ***could*** affect the workings of the car, lead to engine

problems, and subsequently cause traffic accidents"), *citing Cholakyan v. Mercedes-Benz USA,*

*LLC*, 796 F. Supp. 2d 1220 (CD Cal. 2011) (sustaining claim where vehicle's water-leak defect

could cause sudden and unexpected engine failure and result in personal injury or death);

*Marsikian v. Mercedes Benz USA, LLC*, No. CV 08-04876 AHM (JTLx), 2009 U.S. Dist. LEXIS

117012, at \*16-17 (CD. Cal. May 4, 2009) (denying motion to dismiss CLRA claim where

plaintiff alleged that air intake systems were "susceptible to clogging" and the defect could lead

to "substantial electrical failure" because "it is not implausible that the [clogging] would cause

'catastrophic engine and electrical system failure' while the car is on the road.").[14]

### 4. Plaintiff Relied, To His Detriment, On HP's Affirmative Misrepresentations and Omissions.

HP finally argues that Plaintiff has not adequately alleged that he relied on HP's

misrepresentations and omissions.  It stated that he "left out the who, what, when, where and

how" required by Rule 9(b).  HP is intentionally misleading the Court.  The SAC states that "On

or about June 10, 2010, Defendant marketed and advertised, and Plaintiff purchased, an HP

Pavilion Slimline s5305z computer through the HP website.  Using HP's website interface,

Plaintiff selected to include in his computer the following components, including a more

powerful, faster, upgraded graphics card... Plaintiff read and relied upon each of the affirmative

---

[14] HP cites *Wilson* to support its argument.  *Wilson*, however, does not require that Plaintiff himself to have been damaged by the safety issue, but only that the he experienced the *defect* that could give rise to a safety issue.  In *Wilson*, plaintiffs pled the existence of "a serious design defect that causes the power jacks…[to] expose owners and users to a safety hazard as a result of severe overheating often resulting in the [computers] catching on fire." *Id.*, 668 F.3d at 1144. The Ninth Circuit held that plaintiffs had not adequately alleged a causal connection between the "alleged design defect and the alleged safety hazard," as the complaint was "silent on whether the power jack's becoming disconnected in any way led to [plaintiff's laptop] catching fire." *Id.* Underlying this determination was the fact that the power jacks could become disconnected over an extended period of time, so plaintiff's laptop may never have had a disconnected power jack. Thus, the problem in *Wilson* was not that plaintiff suffered no safety issue, but that plaintiff may not have suffered from the *defect* that he alleged to create the safety issue; the fire in his laptop could have resulted from other causes.  Here, by contrast, Plaintiff did suffer from the *defect* as the computers were underpowered when sold, and that lack of power caused his computer to melt and otherwise malfunction.  (Dkt.# 29, ¶¶ 3, 22-25, 27, 32, 49, 65-69, 81).

1  misrepresentations and omissions detailed above at the time he selected the Slimline series,

2  selected his model s5305z, chose the components (including the graphics card) and paid for the

3  computer, all of which he did directly through the HP website." (Dkt. # 29, ¶¶ 30-32.)[15]  He

4  makes additional representations about having "read and relied upon each of the affirmative

5  misrepresentations and omissions" during his purchase, after each paragraph alleging such a

6  misrepresentation or omission, including those about (1) "full power" and "ultra-reliable

7  performance," in which HP presented customization options but no disclosure of decreased

8  performance or life-span, (2) ability to do "multi-tasking" and use "complex graphics" and

9  "multimedia," in which HP presented customization options with no disclosure that higher-

10 performance components would actually result in lower performance, (3) "gaming" and "rich

11 graphics," in which HP presented customization options without disclosing that the upgraded

12 components would fail sooner and operate more poorly, and (4) "compact but powerful" without

13 disclosure that the small size would actually lead to inadequate space for a sufficient power

14 supply unit and inadequate air flow for cooling.   (*See* id., ¶¶ 6, 22-25, 32, 49.)  He also pleads

15 that he would not have purchased the computer, as configured, had he known the truth.  (Dkt.#

16 29, 6, 22-26, 32.)   Lesser allegations have been held sufficient.[16]  *See, e.g., In re Apple In-App

17 Purchase Litig.*, 2012 U.S. Dist. LEXIS 47234, at *21 (N.D. Cal. Mar. 31, 2012) (finding

18 sufficient an allegation that plaintiff relied on defendant's statement that "apps" were free).   In

19 any event, at this stage, the Court is to "presume[s] that general allegations embrace those specific

20 facts that are necessary to support the claim." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871,

21 889 (1990).

22       In cases involving "a failure to disclose, positive proof of reliance is not a prerequisite to

23

24 [15] He also pleads that "No other retailer was involved."  (Dkt.# 29, ¶ 26.)

25 [16] HP cites several cases, none of which support dismissal.  For example, in *Hoey v. Sony Elecs. Inc.*, 515 F. Supp. 2d 1099 (N.D. Cal. 2007), plaintiff did not plead a single misrepresentation by Sony.  *Id.* at 1104.   By contrast, here Plaintiff specifically pleads that he purchased the computers
26 through the HP website in reliance on HP's misrepresentations and omissions.  HP citation to *Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123 (N.D. Cal. 2010) is similarly lacking.
27 In *Tietsworth*, while the court did explain what Rule 9(b) requires, it nevertheless held that when a plaintiff alleges omissions, reliance may be presumed.  *See Tietsworth*, 720 F. Supp. 2d at
28 1147.

1   recovery." *Plasencia v. Lending 1st Mortgage*, 259 F.R.D. 437, 447 (N.D. Cal. 2009), *quoting*

2   *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).  Instead, "'[a]ll that is

3   necessary is that the facts withheld be material,' in the sense that a reasonable person 'might have

4   considered them important' in making his or her decision." *Id.; see also Shein v. Canon U.S.A.,*

5   *Inc.*, No. CV 09-00398 AHM, 2010 U.S. Dist. LEXIS 91160, at *10 (C.D. Cal. Aug. 10, 2010)

6   ("a presumption of reliance is most appropriate in cases sounding in fraud where the plaintiffs

7   'have primarily alleged omissions, even though the [p]laintiffs allege a mix of misstatements and

8   omissions'").

9          Finally, "reliance" is not needed for the portion of Plaintiffs' UCL claim that is based on

10  HP's "unlawful" conduct rather than its "misrepresentation."  *See Cel-Tech Communications,* 20

11  Cal. 4th 163 at 180 (explaining that UCL claim can be based on "unlawfulness," "unfairness" or

12  "fraud" and that "unlawfulness" merely borrows violations of other statutes).  Because Plaintiff

13  adequately pleads breach of express and implied warranty, and the breach of warranty caused him

14  to lose money or property (in that his computer was rendered unusable), his UCL claim

15  predicated on those violations must survive.

16         **C.      If Any Allegations Are Insufficient, Leave To Amend Should Be Granted.**

17         If a complaint is dismissed for failure to state a claim, "leave to amend should be granted

18  unless the court determines that the allegation of other facts consistent with the challenged

19  pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture*

20  *Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).  Leave to amend should only be denied "where the

21  amendment would be futile." *DeSoto v. Yellow Freight Sys.*, 957 F.2d 655, 658 (9th Cir. 1992).

22  Should this Court find any of Plaintiff's allegations insufficient, he requests leave to amend.

23  **IV.     CONCLUSION**

24         For the foregoing reasons, this Court should deny Defendant's motion to dismiss second

25  amended complaint.

26         Dated:  November 20, 2012              **GUTRIDE SAFIER LLP**

27                                               /s/ Seth A. Safier
                                                 Seth A. Safier, Esq.
28                                               Attorneys for Plaintiff